**AMERICAN ASSOCIATION OF MEAT PROCESSORS, Plaintiff,**

v.

**Robert S. BERGLAND et al., Defendants.**

**Civ. A. No. 77–1914.**

United States District Court, District of Columbia.

April 28, 1978.

Richard D. Siegel, Washington, D. C., for plaintiff.

Steven E. Murray, Sp. Asst. U. S. Atty., Washington, D. C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

On January 31, 1978, defendants in this case moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Plaintiff filed a memorandum in opposition to the motion on February 13.

On March 31, the Court issued an Order giving the parties notice that it wished to consider materials presented by the parties but outside plaintiff's original pleading. Accordingly, the Court set a date for the submission of summary judgment motions.

These summary judgment motions have now come before the Court. In addition, the Court has considered a statement of points and authorities submitted by plaintiff in opposition to defendants' motion. The Court concludes that certain issues raised in plaintiff's complaint are not ripe for judicial review. Others are fit for adjudication but the Court finds the administrative actions involved were not arbitrary and capricious, abuses of agency discretion, or otherwise contrary to any federal statute. Defendants' motion for summary judgment is therefore granted and the case is dismissed.

### I.

The material issues in this case are not in dispute. On October 18, 1977, the Department of Agriculture published a notice in the Federal Register entitled "NITRATES AND NITRITES IN MEAT PRODUCTS— Statement of Policy, Request for Data." 42 Fed.Reg. 55626 (1977). The document reads in part,

SUMMARY. The Administrator has determined that nitrates and nitrites as currently used in manufacturing cured meat products *have the potential* of interacting with components of the meat to form carcinogenic nitrosamines. As a result, he has established a program *for obtaining from the industry information required to resolve definitive questions* about the safety of the continued use of nitrites and nitrates in such products. (Emphasis supplied.)

The document goes on to establish a deadline for submission of data bearing on the question of "whether" use of nitrites and nitrates in the production of bacon results in the formation of carcinogens. A series of deadlines are set for submission of data "to demonstrate if carcinogenic nitrosamines are formed in cured products other than bacon . . . ."

The notice then prescribes the cooking conditions upon which "data to demonstrate that the use of nitrates and/or nitrites in the production of bacon does not result in the formation" of carcinogens shall be based. The notice also solicits suggestions as to the cooking conditions and testing procedures to be required in the preparation of any data "to demonstrate whether carcinogenic nitrosamines are formed in cured products other than bacon."

The phrases just quoted indicate the Department of Agriculture is gathering data on the issue of whether the use of nitrates and nitrites to cure certain meat products has carcinogenic effects. The clear implication is that the Department has yet to reach a firm conclusion on the carcinogenic potential of nitrates and nitrites and on any regulatory steps that future findings might justify. However, the picture is then confused by additional provisions in the notice. It states there is "limited, but existing knowledge that carcinogenic nitrosamines have been found in several samples of these products" and, in particular, that "[d]ata made available to the Department . . . indicate that carcinogenic nitrosamines are

being found in samples of bacon as prepared for eating." These statements are significant in light of the document's crucial paragraph:

> After review of all data now available to the Department and submitted pursuant to this notice the Administrator [of Food Safety and Quality Service] will determine *the action to be taken to ban* the use of nitrates and/or nitrites in the production of bacon and other cured products unless it is shown that the use of nitrates and/or nitrites will not result in the formation of carcinogenic nitrosamines in *any samples* of that product . . . " (Emphasis added.)

## II.

Plaintiff contends that since the Department has "existing knowledge" that carcinogenic nitrosamines have been found in samples of the pertinent meat products, it already has concluded that the "any samples" requirement cannot be met. Therefore, plaintiff reasons, in effect the decision to "ban" nitrates and nitrites has been reached already; the request for further data is perfunctory; and a "final" agency action has been taken without the necessary recourse to the rulemaking procedures contained in the Administrative Procedure Act, 5 U.S.C. § 553. Plaintiff asks this Court to set aside the "Statement of Policy, Request for Data" until the rulemaking procedures of the APA have been complied with and certain findings alleged to be required by the Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq.*, have been made.

The Court rejects plaintiff's contention that the October 18 notice indicates, by its terms, that it is the final step the Department plans to take regarding a possible ban on the use of nitrates and nitrites in curing certain meat products. The wording of the notice is not as clear as it should be, but its overall tenor suggests the agency is reserving judgment on the action to be taken until interested parties have a chance to submit additional data in rebuttal to the evidence already before the Department. In its "summary" of the notice, the Depart-

ment characterizes the carcinogenic effects of nitrates and nitrites as a "potential," not a certainty. Furthermore, the document is described as establishing "a program for obtaining from the industry information required to resolve definitive questions" about the continued use of nitrates and nitrites. If the questions left to be resolved are definitive, the notice of October 18 is not definitive.

The Court's construction of the October 18 document is supported by the statements of counsel for the government. For example, in a motion to dismiss dated January 31, 1978, counsel states,

> The data solicited through this notice is clearly identified as a factor to be considered in this ultimate decision, and since all such data has yet to be received and analyzed, no decision has been or can be made at this time. Further, any final decision would be made in compliance with the rulemaking provisions of the Administrative Procedure Act (5 U.S.C. § 553). Plaintiff's assertions that the Secretary's decision is a "foregone conclusion" and that the Department has "made up its mind on nitrites" are therefore incorrect and unsubstantiated. At 2.

■ The first six allegations of arbitrary and capricious action in plaintiff's complaint, contained in subparagraphs 15(a) through 15(f), center on the contention that the October 18 notice represents a final decision to ban nitrites and nitrates, albeit at some unspecified point in the future. The Court concludes that the October 18 notice, on its face, rebuts this contention and that, consequently, these six allegations are premature in alleging procedural shortcomings. Because the issues involved are not yet ripe for adjudication, the Court lacks jurisdiction to consider them at this time.

Plaintiff's counsel abandons the contention that the October 18 notice represents final agency action in his February 13, 1978, memorandum of law in opposition to the earlier motion of defendants to dismiss this complaint for failure to state a claim. "The issue of the legality of the ban is not before

this Court, because in fact there has been no ban on nitrites. What is before the Court is the issue of the legality of the Department's October 18 notice in which the Department converted its statutory burden of proving nitrites unsafe into a burden on the meat industry to prove them safe." At 9.

■ Insofar as plaintiff characterizes its complaint as including an allegation of a shift in the burden of proof in violation of the Federal Meat Inspection Act,[1] the plaintiff states a claim which is ripe for adjudication. However, it does not have merit.

21 U.S.C. § 677 authorizes the Secretary of Agriculture and his designees to "prosecute any inquiry necessary to his duties under this chapter." When, as an element in such an inquiry, the Department affords private industry an opportunity to rebut information in the Department's possession, no allocation of a "burden of proof" is involved. In fact, the chance to learn of adverse evidence upon which an agency might rely, and to be heard in response, are key elements of due process. The Court concludes that the request for information by the Department was not arbitrary and capricious.

Plaintiff alleges in subparagraph 15(e) of its complaint that "[t]he Department knew or should have known that any announcement by it of an impending ban . . . would be received among consumers as an official warning for them to curtail their purchases of cured meat products containing nitrates and/or nitrites, to the resulting irreparable harm of processors engaged in manufacturing these products." It follows, plaintiff argues, that publication of the notice was arbitrary and capricious.

Once again plaintiff attempts to portray aspects of due process as being the opposite of what they are. The government asserts in substance that the October 18 notice is a preliminary information-gathering step in a notice-and-comment proceeding being undertaken in accord with 5 U.S.C. § 553.

The Chief Judge of the Court of Appeals for this circuit has written that when agency rulemaking under § 553 works properly, "the agency must make continuous disclosure of the facts and assumptions on which it intends to rely in promulgating its rule." Wright, "The Courts and the Rulemaking Process: The Limits of Judicial Review," 59 Cornell L.Rev. 375, 381 (1974).

Another prominent commentator has concurred. "Every party cannot have the last word and some cutoff is necessary, but a main objective of § 553 procedure should be, as far as practicable, to let anyone comment on all the facts and all ideas that the agency considers." Davis, Administrative Law of the Seventies § 6.01–3 at 179 (1976). It is a "rather fundamental proposition" that "parties must have an effective chance to respond to crucial facts." *Id.* at § 6.01–1–1 (July 1977 Cumulative Supplement).

When a government agency complies with directives such as these and permits private parties a look at its decision-making in process, those parties cannot complain that such disclosures are arbitrary and capricious.

Plaintiff alleges in subparagraph 15(g) of its complaint that the "imposition" of testing and information-reporting functions on meat processors is so burdensome as to be arbitrary and capricious. The Court rejected this argument in its November 11, 1977 Order denying plaintiff's motion for a temporary restraining order and a preliminary injunction, and rejects it now. The October 18 agency notice indicated that the Department of Agriculture had already gathered data on its own, but that the knowledge which had been gained thus far was "limited" and that the request for private testing was based at least in part on "limited national laboratory capability to simultaneously analyze all . . . categories of products." There might well be a point at which a government agency's attempt to direct private parties to conduct experimentation might be an impermissible default of its information-gathering duties under a

---

1. The Court must construe the complaint liberally in order to read this allegation into it, but will assume *arguendo* that it is contained in subparagraph 15(c).

regulatory statute, but the point has not been reached here.

The Court notes, moreover, that the October 18 notice states the "data requested may be submitted by industry associations" as well as by individual processors, which provides a means of reducing individual expense and effort. Since the Department has undertaken testing of its own, called for rebuttal information in accord with sound principles of due process, and suggested a practical means of providing additional data at reduced expense, its actions are not arbitrary and capricious.

This conclusion would not change even if, as subparagraph 15(i) of the complaint alleges and as affidavits submitted by plaintiff contend, each individual processor has to conduct its own tests due to the unique character of its product. According to the affidavits, the cost of testing each unique product type would come to a maximum of $750.–1000. Whether this cost is borne by an individual processor or distributed among several of them, it is not so great as to be arbitrary and capricious.

This is particularly true when considered in light of two related points. First, the Department is, after all, trying to gather data to verify preliminary findings that the products in question might cause cancer. The public's interest in establishing the healthfulness or lack of such for each unique species of product is easily great enough to justify the imposition of the cost involved, no matter how it is allocated.

Second, the suggestion that methods of processing meat are not at all standardized, and that potentially carcinogenic curing substances are being used in ways that defy any effective testing on a large scale, is a point in favor of placing the burden on individual processors rather than on a single regulatory agency.

The last allegation to be considered is stated in subparagraph 15(h), to the effect that the deadlines set by the Department for the submission of test results are so stringent as to be arbitrary and capricious. Other than for bacon, which has

been the focus of research between the Department and private industry, the deadlines imposed in October ranged from six to twenty-four months, depending on the product. These dates suggest the Department is sensitive to the possibility that different products might raise different testing problems. The Court concludes that these deadlines are not arbitrary and capricious with regard to either the specific time frames established or the variation among them.